UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ROBERT LEE SCOTT,<br><br>        Petitioner,<br><br>  v.<br><br>DANIEL PARAMO,<br><br>        Respondent. | No. 2:16-cv-1634 TLN GGH (HC)<br><br><br>FINDINGS AND RECOMMENDATIONS |

*Introduction and Summary*

Petitioner, convicted of child molestation, filed a petition for writ of habeas corpus pro se on July 15, 2016. ECF No. 1. On October 24, 2016 respondent filed a motion to dismiss, ECF No. 15, after which petitioner sought permission to file an amended petition, ECF No. 17. After receiving permission to do so on November 17, 2016, ECF No. 18, he filed a first amended petition on December 22, 2016, ECF No. 21. Respondent filed his answer on March 22, 2017. ECF No. 25. After receiving an extension of time to file a traverse on May 12, 2017, ECF No. 32, petitioner's traverse was filed on June 29, 2017, ECF No. 34. On April 18, 2018 petitioner sought permission to file an amended reply memorandum, ECF No. 37, and the court took notice of the content of the document as an amended response to the respondent's answer, ECF No. 38.

1

1    Asserting some inconsistencies in a young victim's testimony, or that some factual

2  discrepancies exist, petitioner believes that such equates with insufficient evidence.  He also

3  brings forward a non-cognizable claim of being denied advisory counsel as well as two other

4  claims which are without merit (being arrested without a warrant and cruel and unusual

5  punishment).  For the reasons set forth herein, the petition should be denied.

6  *Factual Background*

7    The underlying facts in this case are explained by the Third District Court of Appeal's

8  review of the petitioner's appeal.  The appellate court's summary of the facts is consistent with

9  the court's own review of the review.  Accordingly, it is provided below:

10    Defendant Robert Lee Scott Jr., appeals from a judgment of
      conviction following a court trial.  Defendant was charged with four
11    counts related to allegations that he molested his daughter, A.S.,
      multiple times when she was ages seven through nine years old.
12    The information also alleged that he suffered three prior serious
      convictions, one of which was a robbery conviction from Texas.
13    Defendant pleaded not guilty to the charges and denied the
      enhancements.  After an unsuccessful *Marsden*[1] motion, defendant
14    opted to represent himself at trial but requested advisory counsel,
      which the court denied.  Subsequently, defendant waived his right
15    to a jury trial and following a court trial the court found defendant
      guilty as charged.  The court also found his prior convictions true.
16    After denying defendant's motion to strike the strike allegations,
      the trial court sentenced defendant to an indeterminate term of 223
17    years to life plus a determinate term of 60 years.

18    On appeal, defendant contends that: (1) the evidence was
      insufficient to establish his guilt; (2) the trial court abused its
19    discretion in declining to appoint advisory counsel to aid him at
      trial; (3) the trial court abused its discretion in denying his *Romero*[2]
20    motion to strike his prior strikes; and (4) the evidence was
      insufficient to prove that his prior conviction for a Texas robbery
21    was a serious or violent felony qualifying as a prior strike and the
      serious felony enhancement.  The People agree with defendant that
22    the case should be remanded for retrial on the strike allegation and
      the five-year serious felony enhancement related to the Texas
23    robbery conviction.

24    We conclude that there is substantial evidence supporting
      defendant's guilt in this case where A.S.'s testimony was specific
25    enough under the *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*)
      test, and her testimony was not physically impossible or inherently
26

27  [1]  [Fn. 1 in original excerpted text] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden).*
28  [2]  [Fn. 2 in original excerpted text] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497
     (*Romero*).

2

improbable. We also conclude that the court did not abuse its discretion in declining to appoint advisory counsel because defendant failed to make the requisite showing of need. We do, however, agree with defendant and the People that remand for retrial on the Texas robbery strike allegation is warranted, because the evidence presented at trial was insufficient to establish that this conviction meet the definition of a California serious felony. Lastly, we conclude that the court did not abuse its discretion in denying defendant's motion to strike the strike allegations.

We reverse and remand for retrial as to the Texas robbery serious felon allegation but affirm the judgment in all other respects.

### FACTUAL AND PROCEDURAL BACKGROUND

#### The Charges

Defendant was charged in the First Amended Information with the following counts:

**Count One** – Lewd and lascivious acts with a child under the age of 14 (Pen. Code 288, subd. (a)), occurring on or about November 30, 2006;[3]

**Counts Two** – Sexual intercourse or sodomy with a child 10 years of age or younger (288.7, subd. (a)), occurring on or about and between December 2, 2006 and July 13, 2007;

**Count Three** – Substantial sexual conduct with a child under the age of 14 (§ 288.5, subd. (a)), occurring on or about and between July 14, 2007, and December 1, 2007;

**Count Four** – Sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a)), occurring on or about and between December 23, 2008, and January 6, 2009.

The information also alleged that defendant had suffered three prior serious felony convictions. (§§ 667, subds. (a)(i), 1170.12).

#### *Marsden* and *Faretta* Motions

In May 2011, a doubt was declared as to defendant's competence and proceedings were suspended pursuant to section 1369. In June 2011, while proceedings had been suspended, the trial court heard and denied a *Marsden* motion for substitution of counsel. In July 2011, after counsel submitted the question of defendant's competency on the doctor's reports, the court found defendant competent to stand trial. In August 2011, defendant filed and withdrew *Marsden* and *Faretta*[4] motions. In September 2011,

---

[3] [Fn. 3 in original excerpted text] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

[4] [Fn. 4 in original excerpted text] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562]

3

defendant made another *Faretta* motion. The trial judge gave defendant *Faretta* warnings and granted his motion. In November 2011, defendant waived his right to a jury trial.

## The Prosecution's Evidence

The People presented A.S.'s testimony, a transcript and recording of A.S.'s SAFE interview and the testimony of D.W., A.S's mother.

A.S. testified that defendant molested her exactly ten times between November 2006 and just after Christmas 2008, when A.S. was ages seven through nine years old. At the time of the trial she was twelve years old. A.S. was born on July 14, 1999, and defendant left the family home when she was fifteen months old.[5] In November 2006, defendant reunited with A.S.'s mother, D.W., when he came to visit her after his release from prison, and they were married on December 29, 2006. A.S. was seven years old at that time and had been raised by D.W. and D.W.'s brother, K.W., in Sacramento. A.S.'s uncle, K.W., often took care of A.S. while D.W. was working. When defendant moved into D.W.'s home he began watching A.S. as well.

A.S. testified that during defendant's first visit to the family home after his release from prison, he began molesting her. She testified that the first time was while she was watching television with defendant in the living room and D.W. was taking a shower. Defendant was sitting in a chair near the couch an asked A.S. to come sit on his lap. When she did, defendant placed his hand down her sweatpants inside her underwear and felt around her vagina. Defendant continued to touch A.S. in this manner until they heard the shower door close. Defendant then told A.S. to sit back on the couch. When D.W. came out from the shower, A.S. did not tell her what happened. A.S. explained that her mother had previously instructed her to obey her father.

A.S. testified that the second incident occurred approximately a week after the first and incident and was the first act of sexual intercourse. She and defendant were alone in the house while D.W. was at work. Defendant told A.S. to go to her mother's bedroom, and he followed here. Defendant then directed A.S. to take off her clothes and lay on the bed. A.S. removed her clothes as she was instructed, and defendant removed his clothes. Defendant then put oil on his penis and climbed on top of A.S. Defendant then had sexual intercourse with his seven-year-old daughter. Defendant did not say anything to A.S. while he forced himself on her but had a "weird smile on his face." The oil burned A.S.'s vagina. A.S. testified that defendant kept his penis inside her vagina until "white stuff" came out between her legs, which A.S. saw when defendant got off of her. Defendant then instructed A.S. to change her underwear and not to tell anyone what happened. A.S. did not tell

---

(*Faretta*).

[5] [Fn. 5 in original excerpted text] Defendant was serving time in prison for most of A.S.'s early life.

4

her mother about this second incident.

About two days later, again while D.W. was working, A.S. was sitting on the couch and watching television when defendant instructed A.S. to go to the bedroom and take her clothes off. Defendant again had sexual intercourse with his daughter. Defendant repeated this every time he was alone in the house with A.S. while her mother went to work and K.W. was away, exactly nine times (for a total of ten molestations including the initial fondling).

A.S. testified that D.W. did not work often because she had a part-time position working in the Arco Arena parking lot during Sacramento Kings games but did not work during every game because she did not have seniority. The last molestation occurred shortly after Christmas in 2008. A.S. remembered that her mother had gone to work and asked defendant and A.S. to clean up the Christmas tree. After they finished cleaning up the tree defendant again had sexual intercourse with A.S. as he had done on eight other occasions. In January 2009, shortly after the last incident, defendant left the home but maintained telephone contact with A.S. after that.

A.S. testified that she complained to her mother several times about what defendant was doing to her. The first time A.S. reported the molestations to her mother, D.W. began crying. D.W. then confronted defendant, and he denied any abuse. Even after A.S. reported the molestations to her mother several times, defendant continued to molest A.S. A.S. stopped reporting to her mother because she felt that her mother was not listening to her and as determined to keep defendant in the home to provide A.S. with a father and because D.W. grew up without a father in her life.

When A.S. was in the fourth grade, in November 2009 she went on a trip to Six Flags and confided in a friend, F.J., that her father had been having sexual intercourse with her. About a week later, A.S. was called to the principal's office at school regarding the molestation allegations, which F.J. had reported. The principal, Flora Reed, appeared to know about what A.S. had told F.J. The principal asked A.S. why she had not reported the molestation to an adult and told her that she should have one so. Ms. Reed then arranged for A.S. to speak with a police officer at the school. A.S. told the officer that during several of the incidents defendant put his penis in her buttocks. However, at trial, A.S. explained that she did not understand about sex at the time of the report. To her, defendant was "touching [her] vagina and [her] butt when his penis went in the front." But defendant's penis never went "in [her]butt." She further clarified that each time defendant put his penis inside her vagina, he penetrated inside her all the way to the base of his penis. When the prosecutor asked A.S. how defendant penetrated her, she said that he went "[a]ll the way to the butt," which was similar to her initial statement to the police officer at her school.

During her cross-examination, A.S. testified that defendant gave her a cell phone for her eighth birthday. Defendant bought the phone

for A.S. after winning $20,000 in the lottery. Although the phone was a birthday gift, A.S. believed that it was also a gift in exchange for sexual intercourse because her mother did not want her to have a phone due to her age. Nevertheless, D.W. paid the monthly cell phone bill. A.S. believed that if she continued to allow her father to molest her he would continue to give her gifts.

### A.S.'s SAFE Interview

A.S.'s trial testimony was generally consistent with her SAFE interview, conducted on April 22, 2010. A video of the SAFE interview, People's Exhibit 1, as played during the trial, and the transcript of the interview, People's Exhibit 1-A, was also admitted as evidence. During her SAFE interview, A.S. described many details about the molestations that matched her trial testimony and included some details that were not developed by counsel at trial. For example, A.S. explained that the first molestation occurred on a Friday night after the family went out for pizza, the day after defendant came to Sacramento to visit following his release from prison. She also explained that during the first molestation when defendant had A.S. sit on his lap defendant touched inside her "front part." She was able to describe in detail, consistent with her trial testimony, what she was wearing, where she and defendant were positioned in the living room, and how defendant touched her. She stated that when she tried to move away from defendant, he pulled her back on his lap. She said that defendant had a "weird kinda laugh" while he was touching her. Later in the SAFE interview, A.S. clarified that defendant touched her front area and her back area at the same time with his hand and arm. Specifically, she said that he touched in between her buttock. Importantly, A.S. stated that her mother "came down the hallway" after getting out of the shower but never mentioned the world "upstairs" or anything implying that there were stairs in the home during the course of her SAFE interview.

During the SAFE interview, A.S. also described the next molestation when defendant took her to her mother's bedroom in detail and consistent with her trial testimony. She said that this second molestation occurred on a weekend day during the late afternoon or early evening while her mother was at work. A.S. recalled that she was alone in the house with defendant for approximately two hours between the time her mother left for work and the time her uncle returned home. She explained that defendant put baby oil on his penis, and when he had intercourse with her, it burned and hurt her. She said that she did not think that defendant cared that he was hurting her. A.S. also said that defendant had his hands on her shoulders while he was having intercourse with her holding her down on the bed when she tried to move. She explained that defendant moved up and down for a while and then "eventually white stuff came out." She said that defendant then took a towel and rubbed off "the white stuff," instructed A.S. to change her underwear, and put the bed sheets in the washing machine.

////

A.S. also described the last molestation during her SAFE interview, explaining that it was after Christmas when she was nine years old. She remembered that the pine needles from the Christmas tree were shedding on the floor, and D.W. had asked defendant and A.S. to clean up the Christmas tree while she was at work. She said that after cleaning up the tree and putting it in the dumpster, defendant told her to "go in the bedroom with him and the same thing happened again." She said that it caused her "front part" to burn because he used petroleum jelly.

A.S. also reported that after her mother kicked defendant out of the house in January 2009, A.S. would still talk to him on the phone, often on a three-way call with her stepbrother. Consistent with both her testimony and F.J.'s statement later admitted in evidence by defendant, A.S. explained that she told F.J. about the molestations in November 2009, almost a year after the last molestation. While A.S. had told her mother about the abuse several times early on, she stopped reporting it to her mother because her mother did not believe her. A.S. stated that D.W. thought A.S. did not want defendant in the home.

Finally, A.S. reported that on one occasion, while her mother was watching a movie in the bedroom, defendant was on the computer in the living room looking at pornographic web sites. A.S. walked by him, and defendant called her to sit on his lap while he was looking at the videos. A.S. said that he searched for "how to have better sex" on the computer in front of her and opened videos of people having sexual intercourse. A.S. said that she told her mother, "mom, look what daddy's doing," but when her mother came into the living room defendant had already closed the videos. A.S. also reported that later on D.W. told her that there were similar allegations against defendant in 1995.

### D.W.'s Testimony

D.W. testified that she married defendant in December 2006 and divorced him in December 2008. She and defendant had a child, A.S., together about seven and a half years before they married. D.W. testified that defendant left the home when A.S. was about a year old and returned to live with them when A.S. was seven years old in January 2007. She explained that defendant was paroled in California in 2006 and began visiting in November 2006. He visited "a lot" until he moved into their home in January 2007 he would stay two to three days, sometimes during the weekend and sometimes during the week. She also testified that at one point during their two-year marriage, defendant moved out of her home for a few months.

D.W. began working at the Arco Arena parking lot a couple of weeks after defendant moved in. She worked intermittently and usually during the evenings. In total, D.W. worked during five or six Kings games that season because she started working mid-season and did not have seniority. D.W. further testified that A.S. and defendant were often alone in the house together on the occasions she worked. When he first moved into the house,

defendant did not have permission to pick up A.S. from school, and she would often stay at an afterschool program until 6:00 p.m. At some point after he moved into the house, defendant was allowed to pick up A.S. from school as well.

In early 2007, A.S. reported to her mother that defendant was touching her inappropriately. D.W. said that A.S. complained about the touching more than once. When D.W. confronted defendant about the allegations he denied it and began crying. She then asked A.S. if she was sure that it happened and told her, "Well, [A.S.], if he did it he did it. But don't say he did it just because you don't want him here." D.W. testified that A.S. never retracted her accusations. At one point after A.S. reported the abuse to her mother again, D.S. warned her she could be removed from the household if defendant was molesting her and that she could get in trouble for making a false statement if she falsely reported the abuse. She explained that she did not want to believe A.S. because she loved defendant and wanted to stay with him. She thought that A.S. just resented their relationship and wanted defendant out of the house. D.W. testified that at times, when she and defendant were holding hands, A.S. would come between them. She thought that A.S. was lying because she had lied sometimes in the past. Consequently, D.W. only confronted defendant about A.S.'s allegations once despite the fact that A.S. reported it to her other multiple times.

D.W. confirmed A.S.'s testimony that defendant bought a cell phone for A.S. when she was seven years old. D.W. did not want A.S. to have a cell phone at that age, but defendant bought a phone for A.S. anyway. However, D.W. paid the monthly phone bill. A.S. lost the cell phone at one point and became angry. D.W. felt that defendant gave A.S. too many gifts and toys; however, she said they were usually given on appropriate occasions such as holidays and birthdays. She also confirmed A.S.'s testimony about the report to the principal. D.W. testified that in November 2009, the principal at A.S.'s school, Ms. Reed, contacted D.W. and informed her that A.S. reported that she had been molested. By this time, D.W. and defendant had been divorced for nearly a year.

### Defense Evidence

Defendant testified in his own defense. Additionally, he presented testimony from two physicians who examined A.S. after she reported the abuse, K.W.'s testimony, and F.J.'s witness statement.

### Defendant's Testimony

Defendant denied ever touching A.S. inappropriately.

Defendant testified that he met D.W. in 1998 after he was released from federal custody for a bank robbery conviction. Defendant admitted that prior to that conviction, he had been convicted and served time in prison for another robbery in Texas. He admitted that he was convicted of attempted robbery on September 1, 1977, in Los Angeles County, and convicted of bank robbery on

8

December 8, 1985 in the United States District Court of the Southern District of California.

Defendant explained that D.W. became pregnant with A.S. several months after he began dating her. Defendant testified that after A.S. was born in July 1999, defendant took care of her part of the time and then fulltime once D.W. returned to work in November. In May 2000, federal marshals arrested defendant for failing to report to probation, and he was transferred back to San Diego. Several months later, in August 2000, defendant was transferred back to Texas on a warrant for a parole violation. Defendant testified that while imprisoned in Texas, he completed his Associate of Arts ("AA") degree, earned a certificate in data processing, became a peer health educator and participated in a youth outreach program.

Defendant was paroled to Pomona, California, where his family lived, in November 2006, however, he flew directly to Sacramento to visit D.W. and A.S. for the weekend before reporting to Pomona. He arrived late at night and did not see A.S. until the next day. As A.S. described in her testimony the next day was a school day for her, and the family went out for pizza that night. However, defendant denied touching A.S. while D.W. was in the shower that night. Defendant testified that the following day, the family went to a miniature golf course, and defendant disciplined and spanked A.S. because she nearly hit several people with the golf balls. He testified that after he disciplined A.S., she had a tantrum and told him, "I am going to get you if it's the last thing I do." Later that month for Thanksgiving and again for Christmas, D.W. and A.S. visited defendant in Pomona. During the Christmas visit on December 29, 2008, defendant and D.W. were married.

After he and DW were married, defendant's parole was transferred to Sacramento and he moved into D.W.'s home. Defendant had visited D.W. and A.S. frequently before his parole was transferred. Defendant testified that D.W. was not working during this time period and did not get the job at Arco Arena until April 2007. In March 2007, defendant began working in construction and continued that work until the end of the year. In November and December of 2007, he worked fulltime for a senior citizens' home. Defendant contended that he worked mostly fulltime throughout the year of 2007 and was home alone with A.S. on only a few occasions.

Defendant testified that while he was living with D.W. and A.S., he observed A.S. watching television shows that he believed were inappropriate for a child of her age, such as Jerry Springer and Dr. Phil. He stated that A.S. accused him of raping her during the summer of 2007. Defendant claimed that both D.W. and K.W. lectured her for lying, and D.W. asked A.S. whether she wanted to get her mother and uncle in trouble. He said that he cried following A.S.'s accusation because he thought that his own child did not want him in the house. He admitted that he and A.S. did not get along, and A.S. did not want defendant and her mother holding hands and being affectionate. Later in 2007, the family went to

9

counseling together. Defendant testified that the cell phone he gave A.S. was a compromise gift for her birthday because she really wanted a dog and D.W. did not want animals in the home or the yard. He also explained that the only other gifts he purchased for A.S. were Christmas gifts that were not exorbitant.

By the end of 2007, defendant and D.W. were having marital problems, and D.W. filed for a divorce in early 2008. Between January 7, 2007 and April 16, 2008, defendant served time in "Rancho [*sic*] Consumnes Correctional Center" for another parole violation. When he was released he moved to a transitional living facility in Rancho Cordova. Defendant testified that during this separation from his wife, D.W. still wanted to continue a relationship with him but no longer wanted to be married to him because she was concerned that he would ruin her credit. Defendant moved back into D.W.'s home in May 2008. The divorce was finalized on December 8, 2008. That month, defendant stayed at his father's home in Pomona until around December 29 or 30, when he returned to find that D.W. had packed all his clothes and was dating another man. He moved out of D.W.'s home permanently on January 6, 2009.

Defendant testified that in November 2009, A.S. called defendant to tell him that she wanted various toys and a video game console for Christmas. Defendant did not have a job at that time and was unable to get A.S. any Christmas gifts. He claimed that he did not hear from her again after that, and then in June 2010, Detective Lawrie contacted him to interview him about the molestation accusations. In August 2010 police officers came to his father's home in Pomona with a warrant for his arrest, and he turned himself in.

**Medical Expert Testimony**

Defendant called Dr. Angela Rosas, a medical child abuse expert, to testify. Dr. Rosas examined A.S. on January 7, 2010, which was a little over a year after the last reported molestation. Dr. Rosas testified that A.S.'s anal and genital examinations were normal. However, these findings did not confirm or negate A.S.'s report that she was sexually abused. Dr. Rosas testified that she would expect to find a normal examination in a child who reported nine instances of vagina penetration over the course of approximately two years, "particularly in a child who is examined years after the last episode." Based on her experience of examining over 2000 children in A.S.'s age range for child sexual abuse and the literature involving studies on the subject, after a child sexual abuse victim heals, it is impossible to distinguish a child's examination with healed trauma from a normal child's examination approximately 80 percent of the time.

Dr. Sammy Chang, A.S.'s pediatrician, also testified. Dr. Chang testified that he treated A.S. for vaginitis, with symptoms of vaginal itching and painful urination, on October 13, 2009. Dr. Chang could not say whether the vaginitis could have been caused by a sexual encounter nine to ten months earlier. His records for A.S.

did not note any other complaints of vaginal itching or burning.

**K.W.'s Testimony**

Defendant also called K.W., A.S.'s uncle. K.W. identified the family home where he continues to reside with A.S. and D.W., and stated that it is a single-story home. He testified that at some point during 2006, his hours at work changed and he would leave work at 4:45 p.m. instead of 2:45 p.m. He testified that defendant did not work during 2007. K.W. explained that he would pick up A.S. from school when D.W. was unable to do so. Although the precise duties were unclear, K.W. also testified that A.S. attended an afterschool program during 2006 and 2006 where she would sometimes stay at school until 6:00 p.m., and other times, one of her parents or uncle would pick her up earlier. K.W. also testified that during the years of 2006, 2007, and 2008, defendant and A.S. were alone in the house together two or three times during the week and nearly every weekend that D.W. worked. Finally, K.W. recalled that after defendant won the lottery, he gave K.W. $300 and purchased a computer and desk for the family.

**F.J.'s Statement**

A.S.'s friend who reported the molestations to the principal, F.J. did not testify; the parties stipulated that her testimony would be consistent with her witness statement contained in Defense Exhibit H if called to testify. F.J. made the statement to Detective Lawrie on September 22, 2010, almost a year after A.S. reported the molestations to F.J. Detective Lawrie summarized F.J.'s statement to him as follows: "My friend [A.S.] told me when she was 3 or 4 years old her dad raped her. She told me this when we were at Six Flags last year. We were on a ride and she mentioned it and she told me not to tell anybody. She didn't go in to details except that if she lets him do it to her then he will buy her whatever she wants. She didn't tell me what he bought her though."

**Police Officer Testimony about Interviews with A.S.**

With prosecutor's agreement, defendant was allowed to introduce the preliminary hearing testimony given by the investigating officers concerning their interviews of A.S.[6]

Detective Dean Lawrie testified that he observed A.S.'s SAFE interview and summarized his recollection of A.S.'s statements during the interview. In general, he accurately described the interview. However, he incorrectly testified that during her SAFE interview, A.S. "stated that the second time something happened he had her *go upstairs* into the mother's bedroom and he had her take her clothes off." (Italics added.) A.S. did not use the words "upstairs," "downstairs," "stairs," or any similar words in her SAFE

---

[6] [Fn. 6 in original excerpted text] Defendant told the court that both officers were unavailable; one was on vacation and the other was on paternity leave. The prosecutor acknowledged that he was unable to subpoena either witness.

interview, which is significant because the alleged molestations all occurred in the family's one-story house.

Officer Paul Curtis testified at the preliminary hearing that he interviewed A.S. in November 2009 following her school principal's report of the molestation. He stated that A.S. reported that her father had sexual intercourse with her ten times and that he "stuck his penis in her butt approximately three to four times." He said A.S. told him that during the molestations, defendant took her to the bedroom but he did not recall A.S. describing the location of the bedroom as upstairs or downstairs. Officer Curtis testified that A.S. reported the first molestation occurred right after defendant returned to the family home after his release from prison. The second incident occurred in December 2006.

### Verdict

The trial court found defendant guilty as charged. In discussing the reasons for the conviction, the court explained to defendant that it found A.S. credible and defendant incredible: "I am convinced that the accusation that she ha[d] made against you is truthful, that it was not made to get you out of the home." The court went on to explain that because defendant was already out of the home and divorced from D.W. nearly a year before A.S. confided in F.J., A.S. "had no motive to repeat the accusation to F.J. or to stand by it in subsequent contacts with law enforcement and testify here at trial." Additionally, the court reasoned that A.S.'s various accounts of the molestations were "substantially consistent" with one another. The court said, "There are discrepancies around the edges, I believe, but I believe that they can be accounted for based on, perhaps, in some cases, misunderstanding of what she was saying." While the court agreed with defendant that the timing and the circumstances of the initial fondling raise[d] a plausibility question," after considering all the evidence and testimony, the court concluded "beyond a reasonable doubt that it occurred." Similarly, the court was convinced that even if defendant were correct that A.S.'s accusation of exactly ten molestations was not temporally plausible, there was sufficient evidence of "at least five [instances of sexual intercourse] covering the time periods that were alleged in connections [*sic*] with Counts 2, 3 and 4."

The court pointed out that its verdict was not based on defendant's prior convictions: "I would have found the accusations to be truth [*sic*] beyond a reasonable doubt even if you had no prior criminal record." The court explained to defendant, "the decision for me was based substantially on [A.S.'s] testimony, I believe your testimony that suggests an alibi and suggests that you were in Southern California during critical times. I'm not persuaded that they exclude the possibility that the alleged crimes occurred within the time frames stated in the charging document. [¶] Your alibi was not sufficiently detailed to exclude the possibility that they occurred during those times. . .. [¶] I believe there was ample opportunity available for what [A.S.] alleged occurred to have occurred." Finally, the court noted that it found D.W.'s testimony substantially

credible and that K.W.'s testimony did not affect the result "one way or another."

People v. Scott, No. C069942, spli op. at 1-8 (Cal. Ct. App. May 1, 2015).

*AEDPA Standards*

The statutory limitations of the power of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, 565 U.S. 34, 39 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.2011) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)). Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 63-64 (2013) (citing Parker v. Matthews, 587 U.S. 37, 48 (2012). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the

13

Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, supra, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir.2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas court, 'in its independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous.'" "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, supra, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc). "[Section] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington, supra, 562 U.S. at 100. Rather, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100. Similarly, when a state court decision on a petitioner's

14

claims rejects some claims but does not expressly address a federal claim, a "federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, supra, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir.2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.2003).

The state court need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at its decision. Early v. Packer, 537 U.S. 3, 8 (2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, supra, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Id. at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, supra, 562 U.S. at 98. A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, supra, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. at 101 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)). Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]"

the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir.2013) quoting Harrington, 562 U.S. at 98. Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, supra, 569 U.S. at 64. Nor may it be used to "determine whether a particular rule holding in a prior decision of [the Supreme] Court." Id. at 102. "'Evaluating whether a rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, supra, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir.2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra, 529 U.S. at 412; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.' A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, supra, 562 U.S. at 101 quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

16

must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

With these principles in mind the court turns to the merits of the petition.

*Petitioner's Writ*

Petitioner raises the following grounds for relief in his petition:

1. Petitioner was denied due process insofar as the evidence against him at trial was insufficient to support his conviction. ECF No. 21 at 6.

2. Petitioner was denied due process when the trial court refused to appoint advisory counsel to assist him once he terminated appointed counsel and elected to defend himself in pro se. Id. at 10.

3. Petitioner was denied due process when he was arrested without a warrant and timely appearance before a magistrate. Id. at 11.

4. Life sentence was cruel and unusual.

Petitioner seeks acquittal and release as the proper remedy in his case. Id. at 18.

*Discussion*

A. Claim 1: Sufficiency of the Evidence

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.2005). Sufficient evidence supports a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "After AEDPA, we apply the standards of Jackson with an additional layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). See also the AEDPA standards set forth above. Moreover, petitioner's challenge to the sufficiency of evidence based on credibility of the witnesses is not cognizable in an insufficient evidence claim. See McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir.1994); see also Schlup v. Delo, 513 U.S. 298, 330 (1995) (recognizing that the credibility of witnesses is

generally beyond the scope of sufficiency of the evidence review).

Therefore, when a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson, supra, at 319. In Jackson the Supreme Court articulated a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (*en banc*).

> First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution. Jackson, 443 U.S. at 319, 99 S.Ct. 2781...[W]hen "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326, 99 S.Ct. 2781; see also McDaniel v. Brown, 130 S.Ct. at 673–74.
>
> Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. 2781.
>
> […]
>
> At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt."

Id. at 1164–65.

And, where the trier of fact could draw conflicting inferences from the facts presented, one favoring guilt and the other not, the reviewing court will assign the one which favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). However, the mere fact that an inference can be assigned in favor of the government's case does not mean that the evidence on a disputed crime element is sufficient—the inference, along with other evidence, must demonstrate that a reasonable jury could find the element beyond a reasonable doubt, i.e., "'[a] reasonable inference is one that is supported by a chain of logic, rather than mere speculation dressed up in the guise of evidence.'" United States v. Katakis, 800 F.3d 1017, 1024 (9th Cir. 2015).

18

The discussion by the Court of Appeal is, of course, the starting place for discussion of this issue:

> Defendant contends there is insufficient evidence to support his convictions for all four counts. He argues that because there was no medical evidence demonstrating defendant sexually abused A.S., "the case rested entirely on A.S.'s word." He contends that the trial court's finding that A.S.'s testimony was credible "is not supported by substantial evidence and [] her testimony in certain regards falls into the category of inherently improbable and thus insufficient to sustain a finding of guilt." To support this assertion, defendant first argues that A.S.'s testimony was improbable because it is illogical, and therefore unlikely, for a child molester to begin molesting a child with no knowledge of what her reactions might be.[7] Second, he argues that A.S.'s testimony is inherently improbable because defendant was absent from the home and in Southern California during the time when the second molestation allegedly occurred, which A.S. testified occurred about a week after the first molestation. Third, defendant points to inconsistencies between A.S.'s investigative interviews and her trial testimony regarding whether the molestations occurred in an "upstairs" bedroom and whether defendant sodomized A.S. Fourth, defendant contends that A.S. had a history of lying. Lastly, defendant argues that A.S.'s testimony is improbable because he was not alone with her in the home very often during the pertinent two-year time period.

> When we review a claim that the evidence was insufficient to support a conviction, "the relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573] (*Jackson*). Under this deferential standard, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing from it. (*In re James D.* (1981) 116 Cal.App.3d 810, 813.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the

---

[7] [Fn. 7 in original excerpted text] We are perplexed by defendant's argument that A.S.'s testimony was improbable because "[i]t is simply not likely that [defendant] would return home after a six year absence and with no knowledge of what kind of child A.S. was and what her reactions might be, [and] immediately put his hands down her pants while her mother was in the shower." In his reply brief he doubles down on this argument and claims that the first molestation "defies logic." While we agree that this behavior was senseless and illogical, as is typical among child molestations, we disagree that the senselessness of sexually assaulting a child while her mother is in the shower provides defendant an improbability argument on appeal.

facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*).) While defendant concedes that these are the applicable standards, he would seemingly have us ignore them.

The People contend that the evidence meets the three-part test of *Jones, supra*, 51 Cal.3d at page 316, which defendant did not reference in his briefing. We agree. In *Jones* our Supreme Court addressed the evidentiary difficulties presented when children are molested over a period of time by someone close to them. In such cases, the child "may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any of such incidents." (*Id.* at p. 305.) The *Jones* court balanced competing concerns presented in these cases: a child molester should not be immunized from criminal liability merely because he molested his victim repeatedly over an extended time period, yet a defendant has a due process right to notice of the charges against him and a reasonable opportunity to defend against those charges. (*Ibid.*) Rejecting the argument that generic testimony is inherently insufficient, the *Jones* court reasoned: "It must be remembered that even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction." (*Id.* at p 314.)

The *Jones* court held that a child victim's generic testimony about molestation is sufficient if the child is able to "describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct intercourse oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Jones, supra*, 51 Ca.3d at p. 316.)

Further, our Supreme Court has held that the testimony of the victim is alone sufficient evidence to support a conviction: "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see *People v. Mayberry* (1975) 15 Cal.3d 143 150; *People v. Allen* (1985) 165 Cal.App.3d 616 623.) While a reviewing court will not

uphold a judgment or verdict based upon evidence that is inherently improbable, testimony that merely discloses unusual circumstances does not come within that category. (*People v. Barnes* (1986) 42 Cal.3d 284, 306.) Evidence is inherently improbable when it is either physically impossible or its falsity is apparent without resorting to inferences or deductions. (*Ibid.*) " ' "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' [Citation.]" (*Ibid.*)

Here, defendant was charged and convicted of four counts, one count of lewd and lascivious acts with a child under the age of 14 (§ 288, subd. (a)); two counts of sexual intercourse with a child 10 years of age or younger (§s 288.7, subd. (a)); and one count of substantial sexual conduct with a child under the age of 14 (§ 288.5 subd.(a)). Based on the dates alleged in the charging document – effectively alleging the two sexual intercourse charges as the first and last acts of sexual intercourse and the substantial sexual conduct charge as acts of sexual intercourse that occurred in between – the prosecution was required to prove only one lewd and lascivious act and five acts of sexual intercourse.[8]

As for the proof, A.S.'s testimony was very specific as to the circumstances of the molestations and the sexual acts. However, some of her testimony was generic regarding the time frame. A.S.'s testimony that defendant had sexual intercourse with her nine times over the course of two years every time she was left alone in the house with him when her mother went to work and her uncle was absent, was corroborated by her mother's testimony that A.S. and defendant were often alone in the house together on the occasions she went to work. Additionally, K.W. testified that during the years of 2006, 2007, and 2008, defendant and A.S. were alone in the house together two or three times during the week and nearly every weekend that D.W. worked. While D.W. testified about working only five or six Kings games during the first half of 2007, her testimony and that of K.W. was sufficient to establish defendant's access to A.S. and support A.S.'s testimony that defendant engaged in sexual intercourse with her every time her mother went to work and she was alone with defendant, nine times in total over the course of two years. The molestations were not, as defendant asserts, inherently improbable where three witnesses testified that defendant was often left alone with A.S. while D.W. worked, and the evidence certainly satisfies the three-part *Jones* test. A.S. described the molestations in significant detail, gave the number of times they took place, and provided the time period when they occurred.

---

[8]  [Fn. 8 in original excerpted text] Section 288.5, subdivision (a) requires a showing of at least three acts of "substantial sexual conduct," such as sexual intercourse, or at least three acts of lewd or lascivious conduct, over a three-month period by a person residing in the same home with the victim or who has recurring access to the victim. (See also § 1203.066, subd. (b) [defining " ' substantial sexual conduct' " to include penetration of the vagina by the offender's penis.].)

Although defendant characterizes A.S.'s testimony as inherently improbable, in actuality he asks this court to go beyond its province by considering the credibility of the witnesses and reweighing the evidence. (See *Maury, supra*, 30 Cal.4th at p. 403.) For example, he contends that A.S.'s testimony is inherently improbable because of her alleged history of lying and inconsistencies between A.S.'s police interviews and her trial testimony. These arguments boil down to credibility attacks on appeal after the trial court, which watched both A.S. and defendant testify, expressly found A.S. credible and defendant incredible: "I am convinced that the accusation that she has made against you is truthful, that it was not made to get you out of the home." Additionally, the court found that because defendant was already out of the home nearly a year before A.S. confided in F.J., A.S. "had no motive to repeat the accusation to [F.J.] or to stand by it in subsequent contacts with law enforcement and testify here at trial." Further, the court specifically found that A.S.'s various accounts of the molestations were substantially consistent" with one another. Appellate courts may not disturb factual findings on appeal where the testimony is sufficient under the *Jones* test for "*any* rational trier of fact [to find] the essential elements of the crime beyond reasonable doubt." (*Jackson, supra*, 443 U.S. at p. 319.)

Here, the inconsistencies defendant describes, if inconsistent at all, are minor. For example, while A.S. first reported to officer Curtis that defendant put his penis in her buttocks, she later clarified at trial that because defendant had touched her buttocks with his penis while he was having vaginal intercourse with her, she thought that defendant's penis had been inside her buttocks, but defendant never had anal intercourse with her. Additionally, at the SAFE interview, A.S. explained that defendant touched her vagina and in between her buttocks at the same time with his hand and arm during the initial fondling. The case was not prosecuted on a sodomy theory, and these inconsistencies between her first police and interview and subsequent SAFE interview and trial testimony may be explained by her age and lack of sophisticated knowledge about her anatomy and sex.

Defendant misleadingly cites Detective Lawrie's incorrect testimony at the preliminary hearing that during A.S.'s SAFE interview, she "stated that the second time something happened [defendant] had her go upstairs into her mother's bedroom." In fact, as reflected by the video recording and transcript, she did not use the words "upstairs," "downstairs," or "stairs" during the interview.

The purported anal intercourse inconsistency, the "upstairs" red herring, and the other alleged inconsistencies defendant raises are either minor or not inconsistencies at all. Accordingly, we will not disturb the court's finding that A.S.'s various accounts of the molestations were "substantially consistent" with one another.

We conclude that the evidence is sufficient to support the verdicts.

1  <u>People v. Scott</u>, No. C069942, slip op. at 9-11.

2       The factual summation of the trial given by the Court of Appeal, presumed correct, is set

3  forth in full above.[9]  It is to that factual analysis that petitioner must show to be such a distortion,

4  that reasonable jurists reviewing the record could not come to the conclusion about the

5  sufficiency of the evidence, i.e., that no reasonable juror could not have arrived at the verdict

6  which the judge, who was the factfinder in this case, did.  Given the limitations of the amended

7  petition and traverse, all the undersigned can do is make a general record check, especially that

8  pertinent to the defense.  The court has done that, reading the elements of the transcript of the trial

9  that address the "deficiencies" petitioner argues render the evidence insufficient in this case.  That

10  review demonstrated that the very detailed exposition by the appellate court was accurate.  A.S.'s

11  testimony was clear, the judge's explanation of the basis for his findings was equally clear.

12  Petitioner, on the other hand, has not shown what could be viewed as a distortion of the evidence

13  sufficient to conclude that no reasonable juror could have arrived at the verdict which this judge

14  did and thus the petition fails on this claim.  <u>See</u> <u>Lumentut v. Hartley</u>, 2014 WL 1779475 *8

15  (E.D.Cal. 2014).  In essence, petitioner raises three scenarios from the evidence presented at trial

16  that he asserts demonstrate a defective determination by the trial judge.  First, he raises what he

17  sees to be discrepancies in A.S.'s testimony that he argues are fatal to the verdict: a claim of

18  sodomy in one interview which is denied during trial testimony resulting in a suggestion that

19  A.S.'s testimony is wholly unreliable; and her testimony that defendant took her "upstairs" to

20  molest her when the house in which they live was a single story dwelling.

21       The trial judge explained his resolution of what this court will refer to as the "sodomy

22  discrepancy"[10] in a manner that, even without the <u>Jackson</u> presumption, satisfies his court that his

23  decision was reasonable under the authority cited here.  He informed petitioner that his decision

24  was mainly grounded in A.S.'s testimony insofar as he found that "[h]er recounts of what

25  ───────────────
[9]  The court iterates that it compared the appellate court's summary of the evidence in its opinion

26  to the actual transcript of testimony given in the case lodged by respondent and found the two –
summary and actual testimony -- congruent.

27  [10]  It is to be noted that the court explicitly struck the sodomy allegations from Count 2 of the
charges, Reporter's Transcript ["RT"] Volume II, at 415:19-23, and from Count 4 as well.  <u>Id.</u> at

28  416:11-14.

happened have been substantially consistent.  There are discrepancies around the edges, I believe, but I believe that they can be accounted for based on, perhaps, in some cases, misunderstanding of what she was saying.  The core of what she said, I believe, have been consistent."  RT, Vol. II, 413:22-27.

With regard to the "upstairs" issue, the appellate court could not find such a reference in A.S.'s trial testimony, RT Vol. I at 137-202, and the record of her SAFE statement, Clerk's Transcript on Appeal ["CT"] Vol. I at 290-300-Vol. II at 301-333, and the undersigned could not find such a reference either.  The sole reference to upstairs was an initial recounting of the victim's interview statements by a detective in his preliminary hearing testimony.  Characterized as a "red herring" by the Court of Appeal, the undersigned agrees.

Finally, there is the four line statement of F.J., CT Vol. 1 at 15, to whom A.S. told her story which F.J. then reported resulting in the genesis of this prosecution as described in the appellate opinion above, in which she said A.S. told her that she had been repeatedly raped by father when she was "3 and 4 years old," which departs from A.S.'s testimony that the assaults began when she was 7 years old and the fact that defendant was not living with or even in physical contact with A.S. until she was 7 years old.  The trial judge did not comment on this discrepancy but this court, indulging the presumption as it must, finds the anomaly to be meaningless since A.S.'s testimony was consistent, found credible, and did not change from the moment of disclosure to the school principal through her testimony on the stand and it was on this finding that the verdict rested.  Petitioner did not question A.S. about the statement of F.J. and the court is in no position to speculate as to the reason for the discrepancy but finds it to be a non-dispositive factor.[11]

B. Claim 2:  Denial of Request for Advisory Counsel

The appellate court provided the following background for this issue:

////

////

---

[11] It is far more likely that the actual statement was "three or four years ago," or "for about 3 or 4 years."

## A. Background

During discussion of the in limine motions, the trial court asked defendant if he had been advised of his *Faretta* warnings and cautioned him against proceeding in pro per. The following colloquy took place:

"THE COURT: [Defendant] obviously, you've been advised that you're entitled to be represented by an attorney in this manner. [¶] Apparently, we have Faretta warnings that are in the file. [¶] You've been advised of what your Faretta warnings are, correct?

"[DEFENDANT]: Yes sir.

"THE COURT: I can only imagine that someone advised [] you [that] this was a really bad idea to be representing yourself and that there are attorneys that handle these types of matters that are experienced attorneys and certainly would be –

"[DEFENDANT]: -- Your Honor, I was represented by the Public Defender's Office. And in one year, they put my case off numerous times, even know [*sic*] I asked for a speedy trial, and they never did anything the whole year. Never investigated the case, never did anything. [¶] At that point, I tried a Marsden motion. It didn't work. They said they were doing their job. I had no choice but in order to go to trial or defend myself.

"THE COURT: You do have a choice, and I'm not going to get into the details. I didn't hear the Marsden motion. [¶] But I simply would indicate that you haven't attended law school. [The prosecutor] obviously has. [¶] There are procedures that occur in a courtroom that you're not going to be familiar with. I'm not allowed to help you out. I won't be helping you out.

"[DEFENDANT]: Uh-huh. *I understand that I am allowed an advisor and I would request an advisor to help me with the courtroom procedures.*

"THE COURT: What you're entitled to and what I would do is appoint the attorney to represent you. [¶] I'm not going to get into a situation where I've got you representing yourself, an attorney sitting next to you giving you advise and us having conflicts that could be created by that type of situation. [¶] I would be more than happy to appoint an attorney, to represent you and represent your interest because you're looking at a whole lot of – potentially, if this thing doesn't work out the way you're hoping it's going to work out, you're looking at spending the rest of your life in jail. [¶] And it's not – I'm mindful in looking at the charges that, going back to my routes [*sic*], 'This isn't your first rodeo.' [¶] You've been through the system for a long period of time [going] back into the seventies. The allegations are that you have prior convictions in each of the preceding ten – each of the decades 70's, 80's and the 90s. [¶] But, at the same time, it's important that you receive a fair trial. And having an attorney to represent your interest would assist in ensuring that that happens. I will do that, but I'm not going to

25

get into this in-between area of having some advisory person sit next to you. [¶] If you wish an attorney, I will appoint one.

"[DEFENDANT]: I am ready to go forward, your Honor." (Italics added.)

The court acknowledged defendant's decision and proceeded to address the in limine motions.

### B. Analysis

Defendant contends the trial court abused its discretion by refusing to appoint advisory counsel for him. We disagree.

A criminal defendant may waive the right to counsel, choosing self-representation. (*Faretta, supra*, 422 U.S. at pp. 807, 819-821.) The trial court has the discretion to appoint advisory counsel to assist the defendant *if the defendant makes a showing of need.* (*People v. Crandell* (1988) 46 Cal.3d 833, 861-862 (*Crandall*), disapproved on other grounds by *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) In deciding whether to appoint advisory counsel, the trial court may consider "the reasons for seeking appointment of advisory counsel." (*Crandell*, at p. 863.) However, a defendant who elects to represent himself has no constitutional right to co-counsel, advisory counsel, or any other form of "'hybrid'" representation. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1218; see *McKaskle v. Wiggins* (1984) 465 U.S. 168, 183 [79 L.Ed.2d 122, 136] a defendant who elects self-representation "does not have a constitutional right to choreograph special appearances by counsel"].)

Whether to grant a request for the appointment of advisory counsel is left to the sound discretion of the trial court, and if " 'there exists "a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside. . . . " ' " (*Crandell sura*, 46 Cal.3d at p. 863.) "[J]udicial discretion implies the absence of arbitrary determination, capricious disposition, or whimsical thinking. . .. Discretion is abused only if the court exceeds the bounds of reason. . .." (*People v. Henderson* (1986) 187 Cal.App.3d 1263, 1269 (*Henderson*).) However, when a court exercises its sound discretion in declining to appoint advisory counsel, its decision should not be disturbed on appeal. (See, e.g., *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1431 [reasoning that "if (a defendant) is not able to represent himself without the assistance of advisory counsel then he is not competent to represent himself"]; *Brookner v. Superior Court* (1998 64 Cal.App.4th 1390, 1396 [criticizing the practice of appointing self-represented criminal defendants advisory counsel and characterizing it as " 'self-representation-plus' "].

Here, the trial court did not abuse its discretion in denying defendant advisory counsel. Defendant never even attempted to make a showing of need. Indeed, defendant stated that he only wanted the advisory counsel to "help with the courtroom procedures." Moreover, he had already expressed considerable

distrust of his prior court appointed counsel. "[T]hey put my case off numerous times, even [though] I asked for a speedy trial, and they never did anything the whole year. Never investigated the case, never did anything." Given defendant's hostility to attorneys the trial court's concern that appointing advisory counsel could create conflicts in the case was appropriate.

In his opening brief defendant concedes that he "was generally articulate [and] managed to follow proper procedure (i.e., timely file appropriate motions, make and argue/oppose evidentiary objections, question witnesses, and deliver argument to the court)." However, defendant still suggests that the defective areas of his performance at trial indicate that the trial court abused its discretion in denying him advisory counsel. We disagree. The consequential prejudice defendant alleges is the natural result of an untrained criminal defendant representing himself, and it does not demonstrate that the court abused its discretion when defendant indicated a desire for advisory counsel. In our view, defendant's argument merely attempts to do indirectly what he cannot do directly – "a pro se defendant may not claim incompetent representation as a basis for reversal on appeal." (*Crandell*, *supra*, 46 Cal.3d at p. 856,)

Defendant points out that the complexity of the case is a factor courts consider. (See *People v. Clark* (1992) 3 Cal.4t 41 111; *Crandall, supra* 46 Cal.3d at pp. 863, 864.) He contends that this factor cuts in favor of granting advisory counsel in this case because the case "involved extremely serious charges of child molest for which the consequence of conviction are extreme." He adds "the handling of a child molest case from a defense perspective is a highly specialized undertaking requiring special skill and knowledge." Yet, defendant cites no peculiar or unique factual or legal issues in this case. As a consequence, his argument essentially equates to the notion that all self-represented defendants in child molestation cases are entitled to advisory counsel. Moreover, defendant's generic description about the seriousness of the charges and the consequences of conviction would apply with equal force to the multiple murder special circumstance case in *Crandell*. Yet, our high court held that the record [did] not demonstrate that denial of [the] defendant's request for advisory counsel would have been an abuse of discretion," had the trial court exercised discretion. (*Crandell supra,* 46 Cal.3d at p 864*).*

Defendant highlights his purported errors in support of his claim he should have been given advisory counsel.[12] However, because the

---

[12] [Fn. 9 in original excerpted text] Defendant points to "his handling of the issue involving the Conflict Defender's Officer failure to turn over to him the complete discovery in the case such that he was unaware of the [F.J.] statement until after the People had concluded their case" and his failure to request a mistrial; his failure to ask that A.S. be held subject to recall so that he could have confronted her with the inconsistent statement reported by F.J. regarding how old A.S. was when the molests occurred; and his failure to offer any legal argument as to whether his Texas robbery conviction qualifies as a serious felony offense in California, Only his failure to ask that A.S. be held subject to recall relates to courtroom procedures. But on appeal, defendant

27

advisory counsel motion was made before trial, the trial court could not consider defendant's trial performance in exercising its discretion in deciding whether to appoint advisory counsel. (See *Crandell, supra*, 46 Cal.3d at pp 862-864 [review of decision denying advisory counsel focused on factors available to court at the time of the motion].) To consider defendant's trial performance in deciding whether the trial court abused its discretion "would require us to hold the trial court to a impossible standard." (*People v Hernandez* (1999) 71 Cal.App.4th 417, 425 [consideration of facts that came out during the trial is inappropriate in determining whether the trail court abused its discretion in an evidentiary ruling made at the beginning of the trial].) Thus, defendant's performance at trial does not affect our inquiry into whether the trial court abused its discretion.[13]

Here, defendant made it clear he did not want representation, yet he wanted someone to help him with courtroom procedures. Still he continued to express his distrust in his prior court appointed counsel, and the court was justified in predicting conflicts during trial. This case, despite defendant's generic complexity argument, was not that complex; nor were the courtroom procedures complex. The case involved a credibility contest and no esoteric legal issues. Under these circumstances, we cannot say the trial court's conclusion was an "arbitrary determination, capricious disposition, or whimsical thinking" outside the bounds of reason. (*Henderson, supra* 187 Cal.App.3d at p. 1268.)

Accordingly, we conclude the trial court did not abuse its discretion in denying defendant's request for advisory counsel.

People v. Scott, No. C069942, slip op. at 12-15.

Since the decision of the United States Supreme Court in Faretta v. California, 422 U.S. 806 (1975), it has been clear that a defendant in a criminal case has an absolute right to defend himself without the assistance of counsel. Justice Brennan summed up the gravamen of that decision in his concurring opinion as follows:

It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' Illinois v. Allen, 397 U.S. 337, 350—351, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353.

---

does not explain why confronting A.S. about the inconsistency would have yielded helpful results, as opposed to backfiring on him. F.J.'s statement to the detective was made almost a year after A.S. reported the molestations to F.J.

[13] [Fn. 10 in original excerpted text] Review of a defendant's trial performance is appropriate, however, when determining whether the defendant has been prejudiced by the trial court's abuse of discretion. (*Crandell, supra*, 46 Cal.3d at pp. 864-866.), 46 Cal.3d at pp. 864-866.)

422 U.S. at 833.

It is equally clear under Ninth Circuit precedent, however, that "[a] defendant does not have constitutional right to "hybrid" representation. U. S. v. Kienenberger, 13 F.3d 1354, 1355 (9th Cir. 1994) (citing McKaskle v. Wiggins, 465 U.S. 168, 183 (1984); Locks v. Summer, 703 F.2d 403, 407-408 (9th Cir. 1983), *cert. denied*, 464 U.S. 933 (1983)).

Thus, once a defendant has asserted his right to defend himself, and "a district court has determined," as did the trial court here,[14] "that a defendant's waiver of his right to counsel is knowing and intelligent, it *may* appoint standby or "advisory counsel to assist the pro se defendant without infringing on his right to self-representation." (Emphasis added.) U.S. v. Moreland, 622 F.3d 1147, 1155 (9th Cir. 2010). "At the same time a defendant who waives his right to counsel does not have a right to advisory counsel." Id. (citing United States v. Salemo, 81 F.3d 1453, 1460 (9th Cir. 1996); United States v. Kienenberger, 13 F.3d 1354, 1356 (9th Cir. 1994)); see also Jensen v. Hernandez, 864 F. Supp 2d 869, 908 (E.D. Cal. 2012).

Finally, in Pickett v. Duncan, 2003 WL 220000309 *2 (9th Cir. 2003), the Ninth Circuit pointed out that "there is no Supreme Court decision establishing a right to advisory counsel." This court relied cited to and relied on that decision in Asberry v. Scribner, 2008 WL 4224759 (E.D. Cal. 2008), and a thorough search has shown that no such right has since been accorded by the United States Supreme Court.

As was made clear in the Standards section of this Findings and Recommendations, under AEDPA, 28 U.S.C. section 2254(d) there are only two bases pursuant to which a federal court my address a habeas corpus petition brought by a state convicted petitioner.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

---

[14] It is appropriate to note at this juncture that the trial judge made the following statement just before he rendered his verdict: "I will say at the outset here, Mr. Scott, I commend you for your handling of your defense. I appreciate that you have been composed, and I think you handled yourself very well in the courtroom. In some respects better than some of the lawyers who have ever appeared before me; . . . RT Vol. II at 412:23-27.

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Thus, pursuant to AEDPA, petitioner's claim regarding the denial of his request for advisory counsel to assist him during trial is not a cognizable claim.

## C. Claim 3: Warrantless Arrest

Petitioner clams that he was arrested without a warrant, and transferred to Sacramento County without a hearing. Even if this assertion is true,[15] petitioner has stated no cognizable claim. Petitioner does not allege that he had no opportunity to raise this claim during pretrial and/or trial proceedings, nor does he allege whether he took advantage of the procedures utilized by California courts, i.e., a suppression motion.

Alleged warrantless arrests, a claim under the Fourth Amendment, are not cognizable in federal habeas corpus under the Stone v. Powell rubric, if there was a full and fair opportunity to litigate any such claim. Terrovana v. Kincheloe, 912 F.2d 1176, 1178 (9th Cir. 1990). "'The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided.'" Ortiz–Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir.1996)." Newman v. Wengler, 790 F.3d 876, 880 (9th Cir. 2015). Of course, one cannot claim the absence of a hearing as a "lack of opportunity" when one never sought the hearing. The claim should be denied.

## D. Claim 4: Cruel and Unusual Punishment

Petitioner claims his sentence of 283 years to life, later reduced to 263 years to life,[16] is

---

[15] In his traverse, petitioner concedes that he "turned himself in," because he had heard there was a warrant. He later discovered that there was no warrant, and petitioner conjures up a conspiracy theory for not being arrested pursuant to a warrant. This is hardly the stuff of a constitutional violation.

[16] According to the Court of Appeal, the initial sentence was 223 years to life with a determinate term of 60 years. The parties treat this sentence as if the determinate and indeterminate years are additive. The undersigned will do the same. Apparently on resentencing after remand from the Court of Appeal, petitioner's determinate term was reduced to 40 years.

cruel and unusual under the Eighth Amendment. There is no doubt that petitioner is serving a life sentence, and for practical purposes, without the possibility of parole. But, despite petitioner's contention that, essentially, he did not leave a [physical] mark, there is no doubt that the offenses for which petitioner was convicted, are among the most serious child molestation offenses that can be imagined. Nevertheless, the issue here is not whether petitioner is correct, but whether reasonable jurists could possibly uphold the sentence in this case.

Respondent cites to the case of Norris v. Morgan, 622 F.3d 1276, 1293 (9th Cir. 2010), and indeed that case is germane to the issue here. In Norris, the defendant was sentenced to life imprisonment without the possibility of parole for the apparent one-time touching over-the-clothes of a young child. This concededly harsh sentence was upheld in an AEDPA context. The conduct in Norris pales with the multiple child rapes for which petitioner was convicted. Petitioner might add, that the defendant in Norris was a recidivist sentenced under Washington's version of a Three Strikes law. However, so too was petitioner a recidivist. If the sentence in Norris could be upheld, there is no doubt that the sentence here is AEDPA reasonable. See also Cordova v. Campbell, 238 Fed. Appx. 234, 2007 WL 1730104 (9th Cir. 2007) (125 years to life upheld for child molestations as not being violative of the Eighth Amendment in an AEDPA context.[17] Accordingly, reasonable jurists could uphold petitioner's sentence and therefore, the claim should be denied.

*Conclusion*

In light of the foregoing, IT IS HEREBY RECOMMENDED that:

1. Petitioner's petition for a writ of habeas corpus should be denied;

2. No Certificate of Appealability should issue; and

3. The Clerk of the Court should close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with these findings and recommendations, any party may file written

---

[17] Unpublished Ninth Circuit cases are not binding precedent, but this case is instructive as to how reasonable jurists could uphold a life sentence for child molestations.

31

objections with the court and serve a copy on all parties. Id.; see also Eastern District of California Local Rule 304(b).  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed with the court and served on all parties within ten (10) days after service of the objections.  Id. Rule 304(d).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated: December 4, 2018

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE